IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LEROY JACKSON,                          :
           Plaintiff,                :                    CIVIL ACTION
     v.                               :
                         :
CITY OF PHILADELPHIA, et al.             :                    NO. 2:10-cv-00457
           Defendants.               :

<u>MEMORANDUM ORDER</u>

AND NOW, this 13th day of June, 2012, upon consideration of (1) Prison Health Services ("PHS") Defendants' Motion for Summary Judgment (Doc. No. 74) and Plaintiff Leroy Jackson's responses thereto; (2) Defendant City of Philadelphia's Motion for Summary Judgment (Doc. No. 76) and Plaintiff's responses thereto; and (3) Plaintiff's "Motion for Reconsideration of Civil Federal Rule 15(c)(3)" (Doc. No. 89), it is hereby ORDERED as follows:

1.     Plaintiff's "Motion for Reconsideration of Civil Federal Rule 15(c)(3)" (Doc. No. 89) is DENIED.  Plaintiff's stand-alone complaint filed on April 28, 2011 (Doc. No. 36) shall remain the operative complaint in this matter.

2.     Prison Health Services ("PHS") Defendants' Motion for Summary Judgment (Doc. No. 74)  is GRANTED.

3.     Defendant City of Philadelphia's Motion for Summary Judgment (Doc. No. 76) is HELD IN ABEYANCE.  On or before Friday, June 22, 2012, the City shall inform the Court in writing as to what discovery, if any, it provided to Plaintiff in this matter.  The City shall also furnish the Court with copies of any such discovery.

I.     <u>Factual Background and Procedural History</u>[1]

This matter concerns injuries sustained by Plaintiff Leroy Jackson ("Plaintiff" or

---

[1]Because this matter comes before us on Defendants' motions for summary judgment, we set forth the facts drawing all justifiable inferences in favor of Plaintiff Leroy Jackson, the non-movant.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986) (remarking that "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor" in resolving motions for summary judgment).

"Jackson") while incarcerated as a pretrial detainee at Curran-Fromhold Correctional Facility ("CFCF") in Philadelphia, as well as the medical care Jackson received for those injuries. According to Jackson, on December 25, 2009, two inmates got into a fight, and the "response team" broke it up. (Doc. No. 36). Other response team members then grabbed Jackson, who was returning to his cell from church. (Doc. No. 85). While dragging Jackson back to his cell, the response team assaulted, hit, and kicked him, causing Jackson to suffer shoulder, back, and neck pain. (Id.). Later that day, Jackson asked C/O Lits[2] if he (Jackson) could "go to medical," but Lits denied his request. (Id.).

Jackson then wrote out and submitted a "sick call request" on a plain piece of paper. In it, Jackson complained of neck, shoulder, and back pain. However, Jackson did not indicate (1) the severity of the pain, or (2) that he needed emergency medical care. (Doc. No. 88, at 31). The next day, December 26th, Jackson submitted another sick call request reflecting that he "was ruffed [sic] up by C.O.'s yesterday and [his] neck shoulder and back is [sic] in pain." (Doc. No. 88, at 32). Again, no mention of severe or excruciating pain, and no indication that his situation was an emergency.[3] That same day, Jackson filed a grievance recounting his previous-day's encounter with the response team and C/O Lits' refusal to let Jackson seek medical treatment. (Doc. No. 88, at 22). This grievance, much like Jackson's sick call slips, reflects that Jackson was "in pain" without quantifying how much. (Id.). Jackson filed another grievance on December 28th, complaining that he still had not been seen by a doctor for his "neck back and shoulder" pain.

---

[2]At times, Jackson refers to this individual as C/O Lites.

[3]Jackson asserts that he complained of "severe pain" on every sick call slip. (Doc. No. 83, at 7). That is flatly incorrect. The very sick call slips Jackson cites to support this argument mention only "pain," not "severe pain."

(Doc. No. 88, at 17).

On December 30, 2009, several days after Jackson first requested medical treatment, he was seen by Defendant Barbara McKennedy, a Registered Nurse.  (Doc. No. 75-4 ("McKennedy Aff.") ¶¶ 3-4).  McKennedy does not know why Jackson was not seen on December 28th or 29th, but he did not appear on her sick call list until December 30th, and she saw him that same day.  (Id. ¶ 4).  Policy calls for inmates to "see medical staff no later than early afternoon" on the day following a sick call request.  (Doc. No. 88, at 29).  Jackson declares that "when [he] presented himself for sick call, his neck was tilted to the side in a spasm and he was holding his right wrist with his left arm to keep it from moving because of the exscusating [sic] pain."  (Doc. No. 85). Jackson has introduced the affidavits of several other inmates to back-up this claim.  (See Doc. No. 88-1, at 54-58).

When McKennedy saw Jackson on December 30th, he was complaining of neck, back and shoulder pain.  Her examination revealed that Jackson had no bruising on his neck, shoulder, and back areas, and that he had a full range of motion in his neck and arms.  (McKennedy Aff. ¶ 5; Doc. No. 88, at 40).  Additionally, Jackson had no shortness of breath, and his vital signs were normal.  (Id.).  In McKennedy's opinion, Jackson was not in severe pain, and she made no objective findings that there was anything significantly wrong with his neck, back, or shoulder. (McKennedy Aff. ¶ 6).  As such, McKennedy recommended that Jackson rest, refrain from heavy lifting, and apply warm compresses as needed until he could be evaluated by a physician's assistant ("P.A.").  (McKennedy Aff. ¶ 6; Doc. No. 88, at 40).

Several days later, Jackson wrote out another sick call slip reiterating that he was "in pain" and had not yet been seen by a P.A. despite Nurse McKennedy's referral.  (Doc. No. 88, at 34).

3

Jackson submitted a grievance to the same effect on January 6, 2010. (Doc. No. 75-2, at 4). Two days later, on January 8, 2010, Jackson was seen by Defendant Karen McKinney, P.A. (Doc. No. 85, at 3; Doc. No. 75-5 ("McKinney Aff.") ¶¶ 4-5). McKinney avers that she saw Jackson the first day he appeared on her patient list, and she does not know why Jackson did not show-up on the list sooner. (McKinney Aff. ¶ 4).

Upon examination, McKinney determined that Jackson was not experiencing any acute distress. He had minimal decreased range of motion in his neck and very minimal decreased range of motion in his right shoulder. (McKinney Aff. ¶ 5; Doc. No. 88, at 41). Jackson also had mild tenderness and tightness between the spine and right shoulder blade. (Id.). In McKinney's medical opinion, Jackson was only experiencing mild discomfort, so she prescribed a ten-day regimen of Percogesic (pain medication). (Id.). McKinney also educated Jackson on stretching exercises for his shoulder, neck, and upper back to help relieve his discomfort. (Id.). Nothing in McKinney's examination indicated that Jackson needed further medical treatment, other than the stretching and pain medication she ordered. (McKinney Aff. ¶ 6).

One week later, on January 15, 2010, Jackson complained that he had not yet received the pain medication McKinney had prescribed. (Doc. No. 88, at 33). Records reflect that Jackson received his pain medication on the 15th, the day of his complaint. (McKinney Aff. ¶ 8; McKennedy Aff. ¶ 8; Doc. No. 75 Ex. F, at PHS 160, 163). Neither Nurse McKennedy nor P.A. McKinney were personally involved in the process of administering medications to Jackson, and neither one can explain the delay in providing Jackson with the Percogesic. (McKinney Aff. ¶ 8; McKennedy Aff. ¶ 8).

Notably, Jackson did not complain of shoulder or back pain during a "chronic care" visit to

his physician on March 16, 2010, two months after he initially received treatment from Defendants

McKennedy and McKinney.  (Doc. No. 75 Ex. F ("Arias Aff.") ¶ 8).  However, Jackson did

complain of back and shoulder pain two weeks later, during a visit with McKinney on March 29,

2010.  (McKinney Aff. ¶ 9).  At that time, Jackson had more pain in his back than in his shoulders

and reported no radiation of pain.  (Id.).  Jackson also said that the previously prescribed

Percogesic had been helpful.  (Id.).  McKinney's examination revealed that Jackson had full range

of motion in his shoulders but complained of pain in his right shoulder when he lifted his arm

above his head.  (Id.).  McKinney observed no deformity in Jackson's right shoulder.  (Id.).  Based

on Jackson's complaints, she prescribed Percogesic for fourteen days on an as-needed basis.  (Id.).

A week or so later, on April 9, 2010, Nurse McKennedy saw Jackson in regards to his high

blood pressure and eczema.  (McKennedy Aff. ¶ 10).  Jackson did not complain about shoulder or

back pain during this visit.  (Id.).  In fact, Jackson's medical records reveal that he was

subsequently seen by medical providers, including his treating physician and a physician's

assistant, on April 12, 2010; April 19, 2010; May 27, 2010; and July 28, 2010, and made no

complaints of shoulder or back pain during any of these visits.  (Arias Aff. ¶ 10; Doc. No. 75 Ex. F,

at PHS 004-007).  Instead of reporting his pain (if indeed it was ongoing), Jackson apparently

decided to self-medicate, buying Tylenol at the commissary and fashioning a sling out of an old t-

shirt.  (Doc. No. 85, at 4).

Then, on September 15, 2010, during another chronic care visit, Jackson reported pain and

a decreased range of motion in his right shoulder.  (Arias Aff. ¶ 11).  At that time, x-rays were

ordered and a routine consultation with an orthopedist was requested on Jackson's behalf.  (Id.).

X-rays taken on September 16th revealed only minor degenerative disease of the shoulder cap; the

x-ray showed no fracture and no dislocation.  (Id.).

Jackson returned to medical on September 30, 2010, based on additional complaints of shoulder pain after falling and hitting his left shoulder at work.  Jackson was instructed to rest the area and apply a warm compress.  (Id. ¶ 13).  Additional x-rays of Jackson's right shoulder were performed on November 18, 2010 for his upcoming orthopedic consultation.  These x-rays revealed no evidence of fracture, dislocation, or other bone pathology.  Further, the soft tissues were within normal limits.  (Id. ¶ 14).

The next day, on November 19, 2010, Jackson met with an orthopedist.  (Id. ¶ 15).  During the consultation, Jackson stated that he was injured a year prior while being arrested.  (Doc. No. 75 Ex. F, at PHS 056).  Jackson reported that "he had bilateral shoulder pain but the right [had] been getting worse over the last year."  (Id.).  Jackson indicated, and a physical examination confirmed, that he had "severely limited range of motion of [the] right shoulder."  (Id.).  The orthopedist diagnosed Jackson with adhesive capsulitis, i.e., "frozen shoulder," and advised him of two treatment options: (1) physical therapy or (2) manipulation while under anesthesia.  (Arias Aff. ¶ 15; Doc. No. 75 Ex. F, at PHS 056).  Jackson selected the second option.  (Id.).

According to Dr. Arias, PHS's Regional Medical Director, "Jackson's frozen shoulder was most likely caused by arthritic changes in his right shoulder observed in his x-rays.  Although frozen shoulder can be caused by trauma, it is not the trauma itself that causes frozen shoulder.  Rather, if a trauma causes a person to suffer a degree of pain that prevents them from using their shoulder, frozen shoulder may develop over time due to the lack of use -- it does not occur instantaneously."  (Arias Aff. ¶ 18).  And in Dr. Arias' opinion, Jackson's subjective complaints and the objective medical findings made by Nurse McKennedy and P.A. McKinney during

Jackson's December 2009 and January 2010 medical appointments reflect that Jackson was *not* suffering from frozen shoulder at that time.  (Id. ¶ 19).

In any event, on November 30, 2010, PHS referred Jackson to an orthopedist to fix Jackson's frozen shoulder.  Doctors performed the procedure on December 6, 2010.  (Id. ¶ 16; Doc. No. 75 Ex. F, at PHS 57-58; Doc. No. 88-1, at 14).  Following the non-invasive surgical repair of Jackson's shoulder, Jackson's surgeon informed PHS that Jackson would need pain medication for 1-2 weeks and should be in physical therapy.  (Doc. No. 75 Ex. F, at PHS 058).  Similarly, Jackson's discharge instructions explained that Jackson "must start physical therapy this week" and "may need pain medication for physical therapy."  (Doc. No. 75 Ex. F, at PHS 064).  On December 7, 2010, the day after his surgery, Jackson was approved to attend physical therapy three times per week through February 7, 2011.  (Doc. No. 75 Ex. F, at PHS 062-063).  Despite this approval and his surgeon's instructions, Jackson contends that he "received no such therapy or post operation pain medication."  (Doc. No. 85, at 4).  Jackson concludes by noting that he "was in a 3 man cell for 9 months."  (Doc. No. 85, at 2).

Seeking recompense in the form of monetary damages, Jackson filed this 42 U.S.C. § 1983 suit against the City of Philadelphia, Prison Health Services ("PHS"),[4] John Doe response team members, Nurse McKennedy, P.A. McKinney, and C/O Lits.  (See Doc. No. 36).  The Defendants have now filed summary judgment motions, and Jackson has responded in opposition.  Jackson has also moved for reconsideration of our January 19, 2012 order denying him leave to amend his complaint one month after discovery closed and mere days before the deadline for filing dispositive motions.  (See Doc. No. 73).  These motions are now ripe for consideration, and for the reasons

---

[4]Now Corizon Health, Inc.

explained herein, we deny Jackson's motion for reconsideration; grant summary judgment in favor

of the PHS Defendants; and hold the City of Philadelphia's summary judgment motion under

advisement.

II.    Legal Analysis

       A.    Jackson's Belated Request to Amend His Complaint

       On March 5, 2012, Jackson moved for reconsideration of our January 19th order denying

him leave to amend his complaint.[5]  (See Doc. No. 89).  Specifically, Jackson seeks to add the

names of various response team members, "the commissioner," and the Deputy Warden of CFCF

to his list of defendants in this suit.  (Id., at 3-4).  Jackson's motion for reconsideration fails for a

number of reasons.  First, it is untimely.  Per Local Rule 7.1(g), Jackson had fourteen (14) days to

seek reconsideration of our order.  Even under the more liberal Federal Rule 59(e), which governs

motions to alter or amend the judgment, Jackson should have filed his reconsideration motion

within twenty-eight (28) days.  We issued the order in question on January 19, 2012, and Jackson

moved to reconsider on March 5, 2012, forty-six (46) days later.  This is undoubtedly too late.

       Second, Jackson has not shown (or even argued) that any of the limited grounds for

reconsideration apply.  See Blystone v. Horn, 664 F.3d 397, 415 (3d Cir. 2011) (a party seeking

_____

       [5]Jackson moved pursuant to Federal Rule of Civil Procedure 15(c), which sets forth the
circumstances in which a *proper* amendment to the pleading relates back to the original pleading
for statute of limitations purposes.  Rule 15(c) says nothing about the situations in which leave to
amend should be granted in the first place.  See, e.g., Winkelman v. United States, No.
4:01–cr–304, 2011 WL 6099553, at *1 (M.D. Pa. Dec. 7, 2011) (explaining that "Rule 15(c)
serves a limited purpose, namely, to ameliorate the effect of the statute of limitations where a
party seeks to amend a pleading pursuant to Rule 15(a).  Bloomfield Mech. Contracting, Inc. v.
Occupational Safety & Health Review Comm'n, 519 F.2d 1257, 1262 (3d Cir. 1975)" in
rejecting petitioner's argument that the court confused Rules 15(a) and 15(c)); Lundy v. Adamar
of N.J., Inc., 34 F.3d 1173, 1196-97 (3d Cir. 1994).  As such, we will address Jackson's
arguments as if he moved pursuant to Rule 15(a).

reconsideration must show "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion . . .; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice.") (citation and emphasis omitted).  As detailed in our prior order, we denied Jackson's latest request to amend his complaint primarily because (1) he moved to amend a month after discovery closed and on the eve of Defendants' submission of summary judgment motions; (2) we already granted Jackson numerous extensions of time and gave him a final deadline of December 8, 2011 for filing a last, stand-alone amended complaint (a deadline he missed by over a month); and (3) allowing Jackson to amend his complaint at this late date would be extremely prejudicial to Defendants, who prepared their case (including summary judgment motions) based on the complaint currently before them.  (See Doc. No. 73).  In other words, Jackson's delay in moving to amend was both undue and prejudicial to his opponents.  See Estate of Oliva ex rel. McHugh v. New Jersey, 604 F.3d 788, 803 (3d Cir. 2010) ("[A] district court may exercise its discretion to deny leave to amend a complaint in situations in which the plaintiff has delayed seeking leave to amend if the delay 'is undue, motivated by bad faith, or prejudicial to the opposing party.'  Bjorgung v. Whitetail Resort, LP, 550 F.3d 263, 266 (3d Cir. 2008) (citing Adams v. Gould, 739 F.2d 858, 864 (3d Cir. 1984)).").

Finally, since Jackson moved for an extension of time to amend his complaint *after* discovery closed and *after* our deadline for amending the pleadings, he must show "good cause" for us to modify our schedule.  See Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent."); see also Dimensional Commc'ns, Inc. v. OZ Optics, Ltd., 148 Fed. App'x 82, 85 (3d Cir. 2005) (confirming that the Third Circuit has "adopted a 'good cause' requirement in determining the propriety of a motion to amend a pleading after the deadline

has elapsed.") (citing E. Minerals & Chems. Co. v. Mahan, 225 F.3d 330, 340 (3d Cir. 2000));

Briggs v. Air & Liquid Sys. Corp., No. 2:11–CV–63521, 2012 WL 975875, at *1 (E.D. Pa. Feb.

13, 2012) (noting that seven Circuit courts have applied Rule 16's "good cause" standard to a

motion for leave to amend the pleadings after a scheduling order deadline had passed.") (citation

omitted).

     Here, Jackson has not shown "good cause" for us to alter the case management schedule so

as to permit his late amendment.  As we explained in our prior order, Jackson had ample time and

opportunity to amend his complaint before the deadline.  (See Doc. No. 73).  Although Jackson

claims that he could not find his paperwork and his hoped-for attorney fell through, we stressed

that Jackson missed the deadline by over a month, not merely a few days.  We opined that, if

Jackson lost his paperwork long ago, well before the deadline, he could have told us at that time.  If

he lost the paperwork relatively recently, then he should have filed his amended complaint by the

December 8th deadline, when he still had the records in his possession.  Finally, although Jackson

did attempt to make some piecemeal changes to his complaint prior to the close of discovery, we

had previously informed him that such amendments would not be permitted.  (See Doc. No. 35).

Given all this, we see no persuasive excuse for Jackson's failure to comply with our deadline

(especially since we had already extended it many times on his behalf).

     B.     The City of Philadelphia's Production of Discovery

     Jackson has bemoaned the City's lack of production of discovery throughout this lawsuit.

See, e.g., Jackson's Motion to Compel (Doc. No. 48); "Affidavit" dated January 16, 2012 ("As of

this date I have not received any discovery requested from the City of Phila, sense [sic] this case

begain [sic] I have only received: answer to action and summary judgment motion.") (Doc. No. 88-

1, at 52).  In August of 2011, we ordered Defendants to either answer Jackson's interrogatories or object as appropriate.  (Doc. No. 54).  While we denied several of Jackson's motions to compel because, based on the limited information before us, Jackson's requests appeared to be overly broad and unduly burdensome, we certainly did not expect the City to produce absolutely no discovery whatsoever.  Further, the City admits that "[d]uring the course of Discovery, Plaintiff did send a discovery request about the training of the 'responds' team and about the City's 'Use of Force' policy."  (Doc. No. 76, at 5).  However, the City does not mention how it responded to this request.

Under the circumstances, we think it would be premature to rule on the City's summary judgment motion at this time.  The Third Circuit "has criticized the practice of granting summary judgment motions at a time when pertinent discovery requests remain unanswered by the moving party."  Sames v. Gable, 732 F.2d 49, 51 (3d Cir. 1984).  These concerns typically arise when a party moves for summary judgment *before* the close of discovery, but the underlying principles (a court's sense of fair play and wariness to render judgment on an insufficient record) have something to say here as well.  As such, by June 22, 2012, the City shall inform the Court in writing as to what discovery, if any, it provided to Plaintiff in this matter.  The City shall also furnish the Court with copies of any such discovery.

C.      Exhaustion of Administrative Remedies

The Prison Litigation Reform Act of 1995 ("PLRA") requires a pretrial detainee such as Jackson to exhaust his administrative remedies before bringing suit in federal court:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are

11

exhausted.

. . .

As used in this section, the term "prisoner" means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program.

42 U.S.C. § 1997e(a), (h).

If a prisoner does not properly exhaust his available administrative remedies, he procedurally defaults his claim.  See Spruill v. Gillis, 372 F.3d 218, 222 (3d Cir. 2004) (holding that "§ 1997e(a) includes a procedural default component.").  "[T]he determination whether a prisoner has 'properly' exhausted a claim (for procedural default purposes) is made by evaluating the prisoner's compliance with the prison's administrative regulations governing inmate grievances, and the waiver, if any, of such regulations by prison officials."  Id.  In other words, "prison grievance procedures supply the yardstick for measuring procedural default."  Id. at 231; see also Jones v. Bock, 549 U.S. 199, 218 (2007) ("Compliance with prison grievance procedures . . . is all that is required by the PLRA to 'properly exhaust.' . . . [I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.").  A prisoner must exhaust his administrative remedies *before* filing suit.  Jones, 549 U.S. at 204 (noting "requirement that inmates complaining about prison conditions exhaust prison grievance remedies *before initiating a lawsuit*.") (emphasis added); Ahmed v. Dragovich, 297 F.3d 201, 209 & n.9 (3d Cir. 2002) (holding that administrative exhaustion must be completed prior to filing suit).

However, "failure to exhaust is an affirmative defense under the PLRA, and . . . inmates are not required to specially plead or demonstrate exhaustion in their complaints." Jones, 549 U.S. at

216.  In analyzing a "failure to exhaust" defense, we take a claim-by-claim approach.  In other words, a prisoner's failure to exhaust with respect to Claim A (1) precludes him from pressing Claim A in federal court, but (2) does not doom Claims B and C, so long as the prisoner properly exhausted with respect to those claims.  See id. at 219-24 (endorsing claim-by-claim approach to exhaustion and rejecting "total exhaustion" rule).  Exhaustion is a question of law for our determination.  Drippe v. Tobelinski, 604 F.3d 778, 782 (3d Cir. 2010).

Here, PHS Defendants argue that Jackson failed to exhaust his administrative remedies because he did not appeal his December 2009 and January 2010 grievances as required under CFCF's grievance policy.  We disagree, primarily because the grievance policy in question makes no mention of an inmate's right to appeal a *medical* grievance.

The "Philadelphia Prisons Policies & Procedures" manual on which Defendants rely, specifically Policy Number 3.F.10, distinguishes medical grievances from standard grievances.  (See Doc. No. 75-13, at 1-2 (defining "Medical Grievance" as one "concerning any aspect of the delivery, non-delivery, or quality of medical services to an inmate," and "Standard Grievance" as "[a]ny grievance formal, or informal, which is not a Medical Grievance or an Emergency Grievance.")).  In other words, medical grievances and standard grievances are mutually exclusive under this policy.  And while an inmate must appeal an adverse decision with respect to his *standard* grievance within five (5) days, id., at 7, the written policy says nothing at all about appealing a *medical* grievance.  Id., at 8-9.  In fact, under the medical grievance policy, *"the Warden* will refer the grievance to the Commissioner for appropriate action" if the issue cannot be resolved at the lower levels.  Id., at 8 (emphasis added).

Here, Jackson checked the "Medical Services" grievance box on his December 28, 2009

13

and January 6, 2010 grievances (Doc. No. 75-2), and PHS Defendants do not dispute that Jackson's grievances pertain to his medical care.  In addition, Jackson apparently sent a letter dated February 2, 2010 to the Commissioner attempting to appeal from his medical grievance.  (See Doc. No. 88, at 20).  Nonetheless, PHS Defendants contend that Jackson failed to exhaust his available administrative remedies because an inmate can in fact appeal a medical grievance, just like a standard grievance, and Jackson failed to do so within the allotted time period.[6]  According to Kim Daniels, the Health Services Administrator ("HSA") for PHS:

> [W]hen an inmate files a grievance concerning medical care, the Deputy Warden forwards the grievance to me as the HSA.  I review the grievance, assess the allegations and provide a response, which I forward back to the Deputy Warden.
>
> Once the medical grievance is returned to the Deputy Warden, the grievance continues through the grievance procedure like a standard grievance: the Deputy Warden reviews my findings and recommends a course of action; the Warden reviews and signs the grievance; and the grievance is returned to the inmate who may choose to appeal within 5 days.
>
> Upon receipt of the grievance recommendation, the inmate may check a box on the grievance form indicating whether he accepts the recommended action.  The inmate also signs the grievance form.  If an inmate checks the box indicating he does not accept the action, he is provided with paperwork for submitting an appeal to the Commissioner through Level II of the grievance process.

(Doc. No. 91-1 ("Daniels Aff. 2") ¶¶ 3-5).

Perhaps this is the way things actually work, but the practice described by Ms. Daniels is not reflected in any of the written polices and procedures provided to the Court.  As such, we do not know how or when (or even if) prisoners are informed of this medical grievance appeal process.  Therefore, we cannot say that Jackson needed to appeal his medical grievances in order to

---

[6]Even assuming Jackson's February 2, 2010 letter to the Commissioner constitutes an appeal, it still comes too late because Jackson signed his grievance on January 22, 2010, which would make his appeal due by January 27, 2010.  (See Doc. No. 91, at 3).

exhaust his "available" administrative remedies.  Stated differently, PHS Defendants have not met their burden of proving failure to exhaust, at least with respect to Jackson's claims stemming from his allegedly inadequate medical care in December of 2009 and January of 2010.

Other courts have held likewise in similar situations, denying summary judgment when faced with a prison's unclear or less-than-transparent grievance policies.  See, e.g., Fortune v. Giorla, No. 11–615, 2011 WL 6739470, at *5 (E.D. Pa. Dec. 22, 2011) (denying summary judgment on failure to exhaust defense because the record did not contain any prison procedures on-point, i.e., policies regarding "how an inmate is to advance his grievance to the next level when he receives no response, or how he is to submit his grievance directly to the Commissioner when he feels he is being denied access to the grievance process."); Kantamanto v. King, 651 F. Supp. 2d 313, 324 (E.D. Pa. 2009) (denying summary judgment on failure to exhaust defense, in part because the "alternative appellate procedure [described by the Deputy Warden] is not specifically mentioned in PPS Policy 3.F.10."); LaFountain v. Martin, 334 Fed. App'x 738, 741 n.3 (6th Cir. 2009) (exhaustion deemed proper when prison policy was unclear and prisoner relied on defendant's advice) (citation omitted); Bolling v. Hayman, No. 08-3183, 2010 WL 338049, at *3 (D.N.J. Jan. 22, 2010) (recognizing that unclear prison procedures may justify excusing the exhaustion requirement) (citation omitted).

We realize that "a remedy need not be formally adopted through regulations by an agency in order for it to be considered an 'administrative remedy' within the scope of § 1997e(a)'s exhaustion requirement."  Concepcion v. Morton, 306 F.3d 1347, 1355 (3d Cir. 2002).  However, we think a grievance policy ought to be written down *somewhere* before we require a prisoner to comply with it on pain of procedural default.  For example, in Concepcion, the administrative

remedy at issue was described in New Jersey's Department of Corrections Inmate Handbook.  Id.
We have no similar documentation here.

On the other hand, we agree with PHS Defendants that Jackson cannot properly assert
claims he failed to exhaust prior to bringing this suit.  As noted *supra*, a prisoner must exhaust his
administrative remedies *before* seeking redress in federal court.  Jones, 549 U.S. at 204; Ahmed,
297 F.3d at 209 & n.9.  Here, Jackson initiated this lawsuit, at the very latest, on March 11, 2010,
when we granted his motion for leave to proceed *in forma pauperis* and entered his complaint
against the Defendants.  (Doc. No. 3).  Therefore, any claims arising after that time are
unexhausted as a matter of law, regardless of whether Jackson filed additional grievances with
respect to these claims during the pendency of this litigation.  The only claim pertaining to PHS
Defendants that falls into this category involves Jackson's averment that, contrary to doctor's
orders, he did not receive physical therapy after his shoulder surgery in December of 2010.  (See
Doc. No. 36).  Jackson has not exhausted his administrative remedies with respect to this claim,
and judgment is entered in favor of PHS Defendants accordingly.

    D.    <u>Jackson's Claims Against PHS Defendants Fail on the Merits as a Matter of Law</u>

Under Federal Rule of Civil Procedure 56(a), we must grant summary judgment if the
movant shows that there is no genuine dispute or issue as to any material fact and the movant is
entitled to judgment as a matter of law.  For example, summary judgment is appropriate where "the
nonmoving party has failed to make a sufficient showing on an essential element of her case with
respect to which she has the burden of proof."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).
"The mere existence of a scintilla of evidence in support of the [non-movant]'s position will be
insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."

Anderson, 477 U.S. at 252.

Pretrial detainees such as Jackson "are protected by the due process clause of the fifth and fourteenth amendments, not the cruel and unusual punishment clause of the eighth amendment." Williams v. Mussomelli, 722 F.2d 1130, 1133 (3d Cir. 1983) (citations omitted).  The Fourteenth Amendment provides at least as much protection as does the Eighth Amendment, and in cases involving allegations of inadequate medical care, courts in the Third Circuit typically analyze the situation using the Eighth Amendment standard.  See, e.g., Gannaway v. Berks Cnty. Prison, 439 Fed. App'x 86, 89 (3d Cir. 2011); Navolio v. Lawrence County, 406 Fed. App'x 619, 622 (3d Cir. 2011); Sylvester v. City of Newark, 120 Fed. App'x 419, 423 (3d. Cir. 2005).  Under this now-familiar two-prong test, litigants such as Jackson seeking to prove constitutionally-inadequate medical treatment must show "(i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need."  Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003).

The first prong ("serious medical need") is objective.  "A serious medical need is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention . . . A medical need is also serious where the denial of treatment would result in the unnecessary and wanton infliction of pain . . . or a life-long handicap or permanent loss."  Atkinson v. Taylor, 316 F.3d 257, 272-73 (3d Cir. 2003) (internal citations and quotation marks omitted).

The second prong ("deliberate indifference") is subjective.  "Deliberate indifference requires more than inadequate medical attention or incomplete medical treatment. 'Acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the

equivalent of recklessly disregarding that risk.'" King v. Cnty. of Gloucester, 302 Fed. App'x 92, 97 (3d Cir. 2008) (quoting Farmer v. Brennan, 511 U.S. 825, 836 (1994)).  Mere disagreement as to the proper medical treatment will not support a deliberate indifference claim.  Spruill, 372 F.3d at 235.  In that same vein, courts generally disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment, which remains a question of sound professional judgment.  Carter v. Smith, No. 11–2863, 2012 WL 1864006, at *1 (3d Cir. May 23, 2012) (citing Inmates of Allegheny Jail v. Peirce, 612 F.2d 754, 762 (3d Cir. 1979)).

Regarding "delayed treatment" cases such as this one, "[d]eliberate indifference can be shown by a prison official 'intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.'" Carter, 2012 WL 1864006, at *1 (citing Estelle v. Gamble, 429 U.S. 97, 104-05 (1976)).  The mere fact that an inmate "may not have received treatment as quickly as he would have liked, or in the manner he would have preferred" does not serve to show a constitutional violation.  Rodriguez v. Secretary Pa. Dep't of Corr., 441 Fed. App'x 919, 923-24 (3d Cir. 2011).  Whether a particular delay constitutes deliberate indifference depends on, for example, the severity of the injury, the reason for the delay, and the ease of providing treatment.  See, e.g., Youmans v. Gagnon, 626 F.3d 557, 564 (11th Cir. 2010); McGowan v. Hulick, 612 F.3d 636, 640 (7th Cir. 2010).

Here, even assuming Jackson's shoulder injury in December of 2009 and January of 2010 qualified as a "serious medical need" (which is debatable), and even construing the facts in the light most favorable to Jackson, no reasonable jury could find that any of the PHS Defendants (Nurse McKennedy, P.A. McKinney, or PHS the entity) were deliberately indifferent to Jackson's needs.  The evidence reflects that, in the hierarchy of things, Jackson's shoulder injury was

relatively minor in late 2009 and early 2010.  His sick call slips and grievances mention "pain," not

severe pain, or excruciating pain, or anything else that would lend one to believe that Jackson

needed emergency care.  Additionally, although Jackson may have presented himself to the

medical staff while holding his arm and tilting his neck, no objective evidence indicates that

Jackson had more than a sore shoulder at the time.  What's more, Defendants did not ignore

Jackson's pain, but rather prescribed pain killers when he said that his shoulder hurt.  In a follow-

up visit, Jackson stated that the pain medication had helped, so it made sense to prescribe the same

pain medication (Percogesic) again.

Further, the delay in Jackson's treatment (injured on December 25 –> saw a nurse on

December 30 –> saw a P.A. on January 8 –> received pain medication on January 15) was

relatively minimal, considering the nature of the injury.  At most, Jackson has shown that he

disagreed with Defendants' course of action and was not treated as promptly as he would have

liked.  That is not deliberate indifference.  See Wood v. Housewright, 900 F.2d 1332, 1333-35 (9th

Cir. 1990) (no deliberate indifference in several day delay in providing inmate with pain

medication for broken shoulder-related injury).  And even if we considered the delay to be

constitutionally problematic, we cannot fault either Nurse McKennedy or P.A. McKinney on this

record because both individual defendants aver (uncontradicted) that (1) they do not know the

reason for the delay, (2) they saw Jackson the day he showed-up on their sick call list, and (3) they

were not involved in actually administering Jackson's pain medication.  See Ashcroft v. Iqbal, 556

U.S. 662, 677 (2009) (each individual is only responsible for his or her own (mis)conduct in §

1983 suit); Casilla v. N.J. State Prison, 381 Fed. App'x 234, 235-36 (3d Cir. 2010) (affirming

summary judgment on deliberate indifference medical treatment claim, in part because the record

was devoid of any evidence as to "why the delay occurred, or how any of the [defendants] were responsible for the delay.").

And even if we could ascribe the delay to any of the Defendants in this action, the evidence reflects that the short delay in treatment did not cause Jackson's subsequent frozen shoulder.  Dr. Arias opined (uncontradicted) that Jackson did not have frozen shoulder at the time the medical staff initially treated him; instead, Jackson's frozen shoulder developed over time.  The objective medical evidence (e.g., Jackson's September 16, 2010 x-ray, which showed only minor degenerative disease of the shoulder cap without any fracture or dislocation) supports this conclusion, as does the fact that Jackson only sporadically complained about shoulder pain throughout 2010 even though he visited medical quite a bit.  With no evidence of causation, Jackson's claims fail as a matter of law.  See Bickel v. Miller, 446 Fed. App'x 409, 413 (3d Cir. 2011) (finding no deliberate indifference, in part because plaintiff's "allegations of delay in providing pain medicine and diagnosis . . . were unsupported by any evidence to show that any delay had an adverse effect on his condition.") (internal citation omitted); Williams v. Allen, 330 Fed. App'x 691, 691 (9th Cir. 2009) (confirming that delay in medical treatment evinces deliberate indifference only if the delay leads to further injury) (citation omitted); Mack v. Wilkinson, 79 Fed. App'x 137, 139 (6th Cir. 2003) (affirming summary judgment on delayed treatment claim because plaintiff "did not allege, much less provide verifying medical evidence to establish, the detrimental effect of any such delay.").

Moving on, PHS as an entity "may not be sued under § 1983 for an injury inflicted solely by its employees or agents."  Monell v. Dep't of Soc. Servs. of N.Y.C., 436 U.S. 658, 694-95 (1978); Natale, 318 F.3d at 583-84 (applying Monell to PHS).  In other words, PHS cannot be held

liable for its employees' bad acts on the basis of *respondeat superior*.   Instead, PHS may face §
1983 liability only if its "policy or custom" inflicts the injury.   Id.   Courts have elaborated on this
basic premise in myriad ways to address the innumerable circumstances in which § 1983 claims
arise, but the general idea is always the same: the entity itself, through its policies or practices,
must be sufficiently culpable before we impose § 1983 liability upon it. See Bd. of Cnty. Comm'rs
of Bryan Cnty., Okla. v. Brown, 520 U.S. 397, 403-04, (1997) (holding that "a [§ 1983] plaintiff
must show that the municipal action was taken with the requisite degree of culpability and must
demonstrate a direct causal link between the municipal action and the deprivation of federal
rights."); Berg v. County of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000) (To prevail, § 1983
plaintiff must establish that "the municipality was the 'moving force' behind the injury alleged.")
(citation omitted).

       Here, Jackson has advanced no evidence of any PHS policy or custom that contributed to
(much less was the "moving force" behind) his alleged injuries.   While Jackson has argued that
PHS adopted a custom of having sick call several days after receiving a sick call slip and has a
policy of denying or delaying treatment for unspecified financial reasons, Jackson has produced no
evidence to support his conclusory allegations.   Even if we were to treat Jackson's arguments as
evidence (e.g., an affidavit or declaration), such conclusory allegations, unsupported by specific
facts, cannot defeat summary judgment.   See Blair v. Scott Specialty Gases, 283 F.3d 595, 608 (3d
Cir. 2002) (noting that "[a]n affidavit that is 'essentially conclusory' and lacking in specific facts is
inadequate to satisfy the movant [or non-movant]'s burden" on summary judgment) (citation
omitted).   At bottom, Jackson's evidence for Monell liability against PHS boils down to this: *my*
treatment was delayed, so PHS must have a *policy or custom* of delaying treatment.   That is plainly

not enough to survive summary judgment.

Finally, we come to Jackson's claim that, despite doctor's orders, Jackson received no pain medication or physical therapy after his frozen shoulder operation.  As noted *supra*, this claim is unexhausted and thus fails under the PLRA.  The claim also fails on the merits.  Jackson has presented no evidence that (1) either Nurse McKennedy or P.A. McKinney had anything whatsoever to do with this (lack of) therapy and provision of pain medication, or (2) that PHS had a policy or custom of denying inmates post-op pain medication and/or therapy.

III.    <u>Conclusion</u>

For the aforementioned reasons, we DENY Plaintiff's motion for reconsideration (Doc. No. 89), we GRANT  PHS Defendants' summary judgment motion (Doc. No. 74), and HOLD IN ABEYANCE the City of Philadelphia's summary judgment motion (Doc. No. 76).

BY THE COURT:

/s/ Legrome D. Davis

Legrome D. Davis, J.
